UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

MONTRELL HOLMES,        )
Plaintiff,              )          17-CV-1160
                        )
    v.                  )
                        )
DR. HUGHES LOCHARD,     )
EDNA GREENHAGEN,        )
STACY BARTLETT,         )
KURT OSMUNDSON, and     )
WEXFORD HEALTH          )
SOURCES, Inc.,          )
                        )
Defendants.

**OPINION**

**SUE E. MYERSCOUGH, U.S. District Judge.**

Plaintiff, proceeding pro se from his incarceration in East Moline Correctional Center, pursues a claim of deliberate indifference to his shoulder injury and pain during Plaintiff's incarceration in Illinois River Correctional Center.

Defendants move for summary judgment, which is granted. Plaintiff thought the time had come to send him to a specialist and order an MRI or CT scan.  That may have been one reasonable approach, but Plaintiff has no evidence that the approach taken by the doctors fell outside acceptable treatment norms.

## Facts

At the summary judgment stage, the evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. <u>Id.</u>

Plaintiff asserts that he injured his shoulder in July 2014 when playing basketball in Pinckneyville Correctional Center. According to Plaintiff, he did not receive adequate care for the injury in Pinckneyville.[1] An x-ray ordered in Pinckneyville showed no fracture, no acute bony abnormality, and no evidence of an AC joint separation. (d/e 53-6, p. 11.)

Plaintiff was transferred from Pinckneyville to Illinois River Correctional Center in January 2015. Plaintiff saw Defendant Bartlett, a nurse practitioner, on January 23, 2015, but Plaintiff does not dispute that he refused to see Defendant Dr. Rankin that day. (Defs.' Undisp. Fact 52.) Why is not clear, but Plaintiff

---

[1] Plaintiff pursued an action in the Southern District of Illinois challenging his care in Pinckneyville for this shoulder injury. <u>Holmes v. Shah</u>, 15-cv-667 (S.D. Ill.) Summary judgment was granted to the defendants, and the case is now on appeal.

appears to have been frustrated by being required to pay $5.00 (the co-pay that IDOC is required to charge when an inmate seeks medical care) for a chronic problem that had been going on for months. (Pl.'s Dep. 20.) Plaintiff does not dispute that Defendant Bartlett did not have the ability to waive the co-pay. (Defs.' Undisp. Fact 66.)

Plaintiff saw a different nurse practitioner about 1 ½ weeks later, on January 24, 2015, for his complaints of shoulder pain. The medical entry from that date reflects that Plaintiff had pain and a decreased range of motion, in that Plaintiff was able to perform the "wall walk" 75% of the way. (d/e 53-5, pp. 5-6.) The wall walk, or wall crawling maneuver, requires an individual to stand flat against the wall and then move their fingers up the wall until their arms are raised. The test is used to determine the possibility of a rotator cuff tear. (Defs.' Undisp. Fact. 12.) The nurse practitioner advised Plaintiff to continue his exercises, apply cool and warm compresses as needed, and follow up with health care if the problem worsened. (d/e 53-5 p. 5.)

Plaintiff saw Defendant Nurse Practitioner Bartlett again on January 30, 2015, this time for complaints of a headache. Plaintiff

does not dispute that the medical entry from this visit reflects that Plaintiff did not complain of shoulder pain at this visit. (Defs.' Undisp. Fact 58.) Defendant Bartlett prescribed ibuprofren, a cool compress, and "encouraged a quiet, dark room." (d/e 53-5 p. 7.)

Plaintiff saw a nurse and a nurse practitioner (not Defendant Bartlett) in March 2015 regarding Plaintiff's continued shoulder pain. Plaintiff received hot packs, range of motion exercises, pain medicine, and a referral to Defendant Dr. Lochard. (d/e 53-5 p. 9-10.) Dr. Lochard is the Medical Director at the Rushville Treatment and Detention Facility, but he also sees inmates at Illinois River Correctional Center when needed.

Defendant Dr. Lochard first examined Plaintiff on March 28, 2015. Plaintiff described his pain as throbbing, burning, and hurting constantly. Plaintiff does not dispute that he had no difficulty completing the wall crawling maneuver at this visit. Dr. Lochard avers that, "based on [Plaintiff's] complaints of pain and range of motion, I believed [Plaintiff's] pain was most likely attributed to a muscle strain with acute or chronic arthritis. I did not believe there was any symptom consistent with a rotator cuff injury or tear in his shoulder." (Lochard Aff. 4.) Dr. Lochard

prescribed Motrin, Robaxin (a muscle relaxant), analgesic cream, and a Toradol shot (an anti-inflammatory). Dr. Lochard advised Plaintiff not to play sports, lift with his shoulder, or sleep on his shoulder or face down. A follow-up appointment was scheduled. (Defs.' Undisp. Facts 11-21.)

Plaintiff saw Dr. Rankin (not a Defendant) on April 21, 2015 to follow up. According to the medical entry, Plaintiff said that the Toradol was wearing off, and Plaintiff described his pain as a level 4. The entry also shows that Plaintiff had full range of motion and mild tenderness at the AC joint. Plaintiff received a shot in his AC joint, but what kind of shot is not stated. (Defs.' Undisp. Facts 22-24.)

About two months later, on June 13, 2015, Plaintiff saw Dr. Lochard, reporting that the shot had helped but had not lasted. Dr. Lochard avers:

> Mr. Holmes informed me that the injection helped, but did not last. Mr. Holmes had left shoulder tenderness in his trapezius and his subacromial region was non tender. As a result, I believed Mr. Holmes pain was attributed to a muscle strain. Because his pain had continued after using anti-inflammatory medications, I prescribed Prednisone, a steroid, in tapering dosages starting at 60mg. I also informed Mr. Holmes to continue range of

motion exercises and to discontinue his Motrin while taking Prednisone.  (Lochard Aff. ¶ 7.)

The next month, on July 11, 2015, Dr. Lochard saw Plaintiff for a follow up.  Plaintiff does not dispute that his shoulder was better.  He was able to move his arm above his head, and he had good range of motion and mobility.  (Defs.' Undisp. Fact 8.)  Dr. Lochard told Plaintiff to continue his range of motion exercises.

However, ten days later, on July 21, 2015, Plaintiff saw a nurse for left shoulder pain.  The medical entry reflects that Plaintiff described a constant stabbing and throbbing pain, rating his pain a 10 out of 10.  (53-5 p. 17.)  Plaintiff was given ibuprofen and had already been scheduled to see Dr. Lochard on August 1, 2015. When Plaintiff saw Dr. Lochard on August 1, Plaintiff reported that the pain had returned during stretching, after the prednisone had been tapered off.  Dr. Lochard ordered a steroid injection for Plaintiff.  (Lochard Aff. ¶ 10.)

Plaintiff received his steroid injection on August 15, 2015.  At that point, before the shot, Plaintiff indicated that his left shoulder "'hurt a lot.'" (Defs.' Undisp. Fact 12.)  The shot appeared to help, as Plaintiff reported about two weeks later, on August 31, 2015,

that his "shoulder was much better and in less pain." (Defs.'
Undisp. Fact 12.)  Plaintiff did complain of some crepitis
(cracking/popping) at this visit.  Dr. Lochard's examination revealed
a good range of motion and nominal tenderness at Plaintiff's AC
joint.  (Defs.' Undisp. Fact 12.)  Dr. Lochard advised Plaintiff to
continue the range of motion exercises and avoid lifting with the
shoulder or sleeping on the shoulder.  This was the last time Dr.
Lochard examined Plaintiff.

The relief from the steroid injection dissipated.  On September
15, 2015, Plaintiff saw Defendant Nurse Practitioner Bartlett for
intermittent complaints of left shoulder pain.  Defendant Bartlett
provided Plaintiff ibuprofen and noted that Plaintiff was already
scheduled to see Dr. Lochard on September 26, 2015.  (Defs.'
Undisp. Fact 60-63; d/e 53-6 p. 4.)  That appointment apparently
did not occur because Dr. Lochard avers that he last examined
Plaintiff on August 31, 2015.

On October 13, 2015, Plaintiff saw Defendant Dr. Osmundson
for complaints of left shoulder pain.  Dr. Osmundson had recently
become the Medical Director at Illinois River Correctional Center.
According to the medical entry from this visit:

Mr. Holmes indicated he had no numbness or tingling, which means there was no nerve involvement. Mr. Holmes was in no apparent distress and he had no complaints of pain to palpation. I noted Mr. Holmes had a decreased range of motion with flexion, rotation, and extension. Mr. Holmes had position pain to palpation of the left trapezius. My assessment based on my examination was a left trapezoid strain. I educated Mr. Holmes on a home exercise program to do three to four times per day. I also prescribed Tylenol for pain for one month. (Osmundson Aff. ¶ 4.)

According to Plaintiff, Dr. Osmundson did not give Plaintiff a steroid injection, explaining that he did not personally believe in steroid injections. (Pl.'s Dep. 30.)

Plaintiff does not dispute that the October 13, 2015 visit with Dr. Osmundson was the last time Plaintiff complained of shoulder pain or was seen by medical staff for shoulder pain. Plaintiff asserts that this was not because his shoulder pain resolved, but because he realized the futility of trying to obtain a referral or imaging tests. Plaintiff filed this case in April 2017 seeking damages and also to be sent to an orthopedist and have an MRI or CT scan. Plaintiff was transferred to East Moline Correctional Center in or around August 2018.

At the time of his deposition in November 2017, Plaintiff described his pain as always there, sometimes bad, sometimes not,

with popping in his shoulder.  (Pl.'s Dep. 54.)   Id.  A hot shower

helped a bit.  (Pl.'s Dep. p. 57.)  Plaintiff asserts in his response to

the summary judgment motion that his pain interfered with his

ability to sleep, wash himself, and exercise.  (d/e 55, p. 11.)  When

asked in his deposition if the pain affected his ability to eat meals or

get dressed on his own, Plaintiff responded, "It just like—it's—

sometimes it hurts, that's all.  Usually I have a pain, daily pain."

(Pl.'s Dep. 63.)  Plaintiff maintains that he was not allowed to take

an auto mechanics class because of Plaintiff's shoulder issue.  (Pl.'s

Dep. 63-64.)

Dr. Lochard avers that his treatment was appropriate

because:

> I did not see any indication of any significant injury such
> as a rotator cuff injury or any type of tear in [Plaintiff's]
> shoulder.  Mr. Holmes responded well to the treatment
> provided which included pain medication and steroid
> injections.  As such, I do not believe any additional
> treatment or imaging was necessary based on his
> indications that he had relief from the treatment that was
> provided.  (Lochard Aff. ¶ 13.)

Dr. Osmundson agrees with Dr. Lochard's assessment:

> It is my understanding that Mr. Holmes is alleging that I
> was deliberately indifferent to his serious medical needs
> for treatment regarding his left shoulder.  I did not see
> any indication of any significant injury such as a rotator

cuff injury or any type of tear in his shoulder.  Mr. Holmes did not show any signs of nerve involvement or AC[2] joint injury and did not return to sick call with any complaints after my examination.  As such, I do not believe any additional treatment or imaging was necessary based on [Plaintiff's] indications that he had relief from the treatment that was provided.  (Osmundson Aff. ¶ 6.)

## Analysis

Deliberate indifference to a serious medical need violates an inmate's Eighth Amendment right to be free from cruel and unusual punishment.  <u>Townsend v. Cooper</u>, 759 F.3d 678, 689  (7th Cir. 2014).  Defendants argue that Plaintiff did not have a serious medical need, but Plaintiff's self-described pain and limited range of motion allow an inference that he did.  Further, the doctors thought the condition significant enough to treat, which is enough to conclude the need was serious in the constitutional sense.  <u>Wynn v. Southward</u>, 251 F.3d 588 (7th Cir. 2001).

The question is whether Defendants were deliberately indifferent.  Deliberate indifference is the conscious disregard of a substantial risk of harm.  <u>Id.</u>  A doctor exercising his professional judgment within accepted professional standards is not deliberately

---

[2]Acromioclavicular joint.

indifferent.  <u>Sain v. Wood</u>, 512 F.3d 886, 894-95 (7th Cir. 2009)("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.")  Deliberate indifference occurs when a medical professional's decision is such a substantial departure from accepted professional standards that an inference arises that the decision was in fact not based on professional judgment at all.  <u>Roe v. Elyea</u>, 631 F.3d 843, 857 (7th Cir. 2011).

Plaintiff's primary argument is that a different treatment approach was necessary after the other treatment approaches failed.  The continued pursuit of knowingly ineffective treatment can amount to deliberate indifference.  <u>Greeno v. Daley</u>, 414 F.3d 645, 655 (7th Cir. 2015).  Plaintiff contends that the next step should have been to refer him to a specialist and/or order a CT scan or MRI.

Generally, the choice of diagnostic tests is entrusted to the medical professional's judgment, including whether to order a CT scan or MRI.  *See, e.g.* <u>Estelle v. Gamble</u>, 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated

is a classic example of a matter for medical judgment."); Jackson v.
Kotter, 541 F.3d 688, 698 (7th Cir. 2008)(doctor's decision not to
refer to orthopedist or for MRI was not deliberately indifferent where
doctor considered x-ray, prior orthopedist report and medical
history)(reversed on FTCA claim).

The decision whether to refer to a specialist is also one
entrusted to the medical professional. *See, e.g.,* Pyles v. Fahim,
771 F.3d 403 (7th Cir. 2014)("A prison physician is not required to
authorize a visit to a specialist in order to render constitutionally
acceptable medical care."); Grund v. Murphy, 736 Fed.Appx. 601
(7th Cir. 2018)(not reported in Fed.Rptr.)(doctor's decision not to
refer inmate to specialist or order MRI regarding breast implant
complications was an exercise of professional judgment).

No rational juror could conclude that Drs. Lochard and
Osmundson failed to exercise professional judgment. Both
concluded, based on their examinations of Plaintiff and Plaintiff's
description of his pain, that Plaintiff's problems were consistent
with a muscle strain, not a rotator cuff or other muscle tear or an
AC joint injury. They also determined that the muscle strain could
be treated in the prison and that a referral or imaging was not

medically necessary.  The fact that Plaintiff was not cured is not evidence that professional judgment was not exercised within acceptable bounds.  *See* <u>Pyles</u>  (no deliberate indifference to inmate's alleged continued excruciating back pain where doctors ordered pain medicine and stretching exercises, refusing to order a second MRI or referral); <u>Ray v. Wexford health Sources, Inc.</u>, 706 F.3d 864 (7th Cir. 2013)(no deliberate indifference where doctor decided no MRI necessary to diagnose cause of inmate's continued shoulder pain).

Plaintiff asserts that Defendant Wexford's protocol required Plaintiff to be referred to a specialist if treatment was not working, but the protocol does not say that.  For chronic shoulder pain, the protocol leaves an orthopedic evaluation to the discretion of the provider.  The only condition requiring referral after six months without healing is a clavicle fracture. (Wexford. Med. Pol. & Proc., Exhibit AA to Complaint.)

Further, no evidence allows an inference that the doctors chose to doggedly pursue treatment they knew would not work.  At Dr. Lochard's last visit with Plaintiff, Plaintiff reported that the steroid shot had significantly helped, and Plaintiff had good range of

motion.  The shot's impact apparently wore off shortly after that visit, but nothing suggests that Dr. Lochard was aware of this.[34] As to Dr. Osmundson, his interaction with Plaintiff was too limited to allow an inference of deliberate indifference.  Dr. Osmundson saw Plaintiff only once, and Plaintiff did not again seek medical attention for his shoulder after that visit.  Plaintiff apparently thought that doing so was futile, but that decision deprived Dr. Osmundson of a chance to evaluate Plaintiff over time and determine whether a change in treatment approach was necessary.

Having concluded that Drs. Lochard and Osmundson were not deliberately indifferent to Plaintiff's shoulder problem, the same conclusion is compelled for Defendants Nurse Practitioner Bartlett, Director of Nursing Greenhagen, and Wexford Health Sources, Inc. With no underlying constitutional violation by the treating doctors,

---

[3] Plaintiff contends in his response that the ibuprofen Dr. Lochard prescribed caused Plaintiff to bleed from Plaintiff's rectum.  (d/e 55, pp. 4, 6.)  This allegation was not part of Plaintiff's complaint nor mentioned in Plaintiff's deposition.  Plaintiff cannot add new claims in response to a summary judgment.  <u>Shanahan v. City of Chicago</u>, 82 F.3d 776, 781 (7th Cir. 1996)("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").  Further, Plaintiff stated in his deposition that Dr. Lochard prescribed ibuprofen only a "couple times," instead favoring Naproxen because of Plaintiff's inability to tolerate ibuprofen.  (Pl.'s Dep. 40.)

[4] Plaintiff also asserts that when Dr. Lochard administered one of the shots, Plaintiff's "whole shoulder [turned] purple, black, red."  (Pl.'s Dep. 15.)  According to Plaintiff, Dr. Lochard said the reaction was normal.  <u>Id.</u>  A reaction to a shot is not evidence of deliberate indifference.  Nothing suggests that the shots were medically contraindicated.

the other Defendants cannot be said to have turned a blind eye. The other Defendants would be required to take action if they knew that the doctors' treatment decisions put Plaintiff at risk of harm, but that situation is not present here. *See* <u>Berry v. Peterman</u>, 604 F.3d 435, 443 (7th Cir. 2010).

To the extent Plaintiff pursues a deliberate indifference claim against the nurses that is separate from the doctors' treatment decisions, no evidence supports that claim. Plaintiff contends that Nurse Bartlett made Plaintiff visit sick call three times, each time paying a $5.00 co-pay, before referring Plaintiff to a doctor for Plaintiff's shoulder pain. That contention is not supported by the record. Plaintiff does not dispute that the first time he saw Defendant Bartlett, Plaintiff refused to see Dr. Rankin. There were only two other interactions between Plaintiff and Defendant Bartlett. The first involved complaints of a headache, and the second regarded Plaintiff's shoulder pain for which Plaintiff already had a doctor's appointment scheduled. As to Defendant Greenhagen, Plaintiff argues that Greenhagen lied by saying she did not recall having a conversation with Plaintiff in which she denied his request to override the doctors' decisions. Not remembering a

conversation is not the same as denying the conversation occurred. The Court has accepted as true that the conversation did occur, but the fact remains that the doctors were not deliberately indifferent.

**IT IS THEREFORE ORDERED:**

1. Defendants' motion for summary judgment is granted. (d/e 53.) The clerk of the court is directed to enter judgment in favor of Defendants and against Plaintiff. All pending motions are denied as moot, and this case is closed, with the parties to bear their own costs. All deadlines and settings on the Court's calendar are vacated.

2. If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis should identify the issues Plaintiff will present on appeal. See Fed. R. App. P. 24(a)(1)(c). If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

ENTER: November 6, 2018

FOR THE COURT:     **s/Sue E. Myerscough**
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE